**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| UNITED STATES OF AMERICA, |
| |
| v. |
| |
| DAVID LEE THOMAS, |
| *also known as* |
| ABDULLAH MALIK THOMAS, |
| |
| *Defendant*. |

Criminal Action No. 17-194 (RDM)

## MEMORANDUM OPINION AND ORDER

Defendant David Lee Thomas moves for release from detention in light of the global COVID-19 pandemic. Dkt. 89. For the reasons explained below, the Court will deny Thomas's motion to the extent he seeks release under 18 U.S.C. § 3145(b) and § 3142(e) but will grant his motion for temporary release pursuant to § 3142(i).

## I. BACKGROUND

### A.     Statutory Context

Under the Bail Reform Act of 1984, 18 U.S.C. § 3141 *et seq.*, if a judicial officer finds after conducting a hearing that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the [defendant] before trial." 18 U.S.C. § 3142(e). In making this assessment, the default is generally that a defendant should be released pending trial, but the Bail Reform Act creates a rebuttable presumption "that no condition or combination of conditions will reasonably assure . . . the safety of the community if . . . there is probable cause to believe that the person committed" one of an enumerated list of crimes,

including a violation of 18 U.S.C. § 924(c). *United States v. Taylor*, 289 F. Supp. 3d 55, 62 (D.D.C. 2018) (quoting 18 U.S.C. § 3142(e)(2)). A grand jury indictment is sufficient by itself to establish probable cause for the purposes of § 3142(e)(2). *See id.* Once the presumption is triggered, the defendant, at a minimum bears a burden of production, and he must offer at least some credible evidence showing that his case falls "outside the congressional paradigm" giving rise to the presumption. *Id.* (quoting *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010)).

If the defendant meets his burden of production, the presumption "does not disappear entirely but remains a factor to be considered among those weighed by the district court." *Id.* (quoting *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001)). Beyond the presumption, the Bail Reform Act specifies four factors a judicial officer must "take into account" in determining whether any conditions of release "will reasonably assure . . . the safety of any other person" and the community: (1) "the nature and circumstances of the offense charged, including whether the offense is a crime of violence, . . . or . . . involves . . . a controlled substance [or] firearm;" (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the [defendant's] release." 18 U.S.C. § 3142(g).

Under 18 U.S.C. § 3145(b), a defendant ordered detained by a magistrate judge may file "a motion for revocation or amendment to the order" with "a court having original jurisdiction over the offense." 18 U.S.C. § 3145(b). Although the D.C. Circuit has yet to opine on the question, substantial precedent supports the view that a magistrate judge's detention order is subject to *de novo* review by the district court, *see United States v. Hunt*, 240 F. Supp. 3d 128, 132 (D.D.C. 2017) (identifying cases supporting this proposition from the Second, Third, Fourth,

Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits), and this Court has previously

followed that course, *Taylor*, 289 F. Supp. 3d at 66.

Section 3142(i) of the Bail Reform Act "provides a distinct mechanism for temporarily

releasing a detained defendant." *United States v. Lee*, No. 19-cr-298, 2020 WL 1541049, at *3

(D.D.C. Mar. 30, 2020).  Under that provision, a judicial officer may "permit the temporary

release of [a] person" to "the custody of a United States marshal or another appropriate person,"

if the judicial officer determines that pretrial release is "necessary for preparation of the person's

defense or for another compelling reason."  18 U.S.C. § 3142(i).  "Most courts addressing a

motion for temporary release under § 3142(i) have done so in the context of evaluating the

necessity of the defendant assisting with preparing his or her defense." *United States v. Clark*,

2020 U.S. Dist. LEXIS 51390, *5–6 (D. Kan. Mar. 25, 2020) (collecting cases).  Although the

statute also permits temporary release for "another compelling reason," 18 U.S.C. § 3142(i),

courts have granted relief on that basis only "sparingly," "typically in order 'to permit a

defendant's release where, for example, he is suffering from a terminal illness or serious injuries,'"

*United States v. Davis*, 19-cr-292, at 3 (D.D.C. Apr. 6, 2020) (quoting *Lee*, 2020 WL 1541049, at

*3).  Regardless of the basis for a § 3142(i) motion, the defendant bears the burden of demonstrating

that his temporary release is warranted.  *See United States v. Stephens*, No. 15-cr-95, 2020 WL

1295155, at *2 (S.D.N.Y. Mar. 19, 2020); *United States v. Dupree*, 833 F. Supp. 2d 241, 246

(E.D.N.Y. 2011).

## B.      Pre-Indictment and Detention Hearing

The Court has previously described the background of this case, *see United States v.*

*Thomas*, No. 17-194, 2019 WL 3859022, at *1–4 (D.D.C. Aug. 15, 2019), and will only briefly

summarize that history here.  On June 28, 2017, officers from the Metropolitan Police

Department ("MPD") "responded to a report of a robbery at a Dunkin Donuts at 4020 Minnesota

Avenue, S.E., Washington, D.C." *Id.* at *1.  According to the lead detective on the scene, the store clerk advised, and the video surveillance confirmed, that a suspect entered the store, waited until no customers were present, pulled a bandana over his face, and approached the register. *See id*.  The suspect pulled out a gun, directed the clerk to open the register and to place money in a red bag, and, in doing so, set his cell phone down on the counter.  *Id.*  In fleeing the scene, the suspect failed to retrieve the cell phone from the counter.  *See id.*

The MPD recovered the cell phone and, after a forensic analysis of the device, determined that it appeared to belong to "Abe Thomas," *id.* at *3, which is allegedly an alias used by the defendant.  Through further investigation, the MPD located Thomas's residence and later obtained and executed a search warrant, resulting in the seizure of, among other items, a black cap with a Superman "S" on the front, red bags, bandanas, cell phones, and a firearm.  *Id.*; Dkt. 62-2 at 1, 4; Dkt. 62-3 at 2.  As relevant here, the black cap the MPD recovered appears to match the cap the suspect was wearing, as shown in the video surveillance footage from the Dunkin Donuts.  *See* Dkt. 80.  Although Thomas previously argued that the affidavit in support of that search was deficient, the Court rejected that contention.  *Thomas*, 2019 WL 3859022, at *3.

On October 17, 2017, Thomas was indicted on one count of Interference with Interstate Commerce by Robbery, in violation of 18 U.S.C. § 1951, and one count of Using, Carrying, and Possessing a Firearm During a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A); both charges arose from the alleged June 28, 2017, robbery of a Dunkin Donuts.  Dkt. 1.  Three days after he was indicted, Thomas was arrested, Dkt. 3, and, on October 25, 2017, Magistrate Judge Robinson conducted a detention hearing pursuant to 18 U.S.C. § 3142, Dkt. 5.

Magistrate Judge Robinson concluded that Thomas was charged with a "very serious" offense—a "gunpoint robbery of [a] Dunkin Donuts"—and that the "weight of evidence against [him] [was] compelling." Dkt. 5 at 5. The government also offered evidence that Thomas "has a lengthy criminal record, including a prior firearm conviction and an escape conviction." *Id.* at 5. Thomas, in turn, argued that his criminal history was stale, that the government had offered "no witness identification or video evidence," and that Thomas had a verified address and ties to the community. *Id.* at 4. After considering the parties' proffers and arguments, Magistrate Judge Robinson concluded that Thomas had failed to rebut the presumption of pretrial detention that applied and that the seriousness of the crime charged and the compelling evidence against him further required that he be detained pending trial. *Id.* at 5.

## C.     Subsequent Developments

Since that denial, there have been some further developments in the case. The grand jury has returned two superseding indictments against Thomas. Dkt. 8; Dkt. 83. The first charged Thomas with fourteen counts arising from the robbery of the Dunkin Donuts and from three additional robberies, allegedly occurring on July 2, 4, 8, and 10, 2017. Dkt. 8. The second superseding indictment dropped the charges relating to the additional robberies and includes only two counts—(1) Interference with Interstate Commerce by Robbery, in violation of 18 U.S.C. § 1951, and (2) Using, Carrying, Brandishing, and Possessing a Firearm During a Crime of Violence, in violation of 18 U.S.C. § 924(c)(A)(ii). Dkt. 83. Both counts arise from the June 28, 2017, Dunkin Donuts robbery. *Id.* In addition, the evidence now shows that the firearm that the MPD recovered and that the government alleges was used in the robbery was inoperable. As the Court has previously observed, the gun "was missing at least three parts: the trigger; the hammer;

and the cylinder pin." *United States v. Thomas*, no. 17-cr-194, 2019 WL 4095569, at *3 (D.D.C. Aug. 29, 2019) (quoting Dkt. 22 at 2–3).

The circumstances in the world have also changed.  COVID-19, a highly infectious disease, is causing a once-in-a-century global pandemic, prompting the President and governors across the nation to declare states of emergency.  *See United States v. Harris*, No. 19-cr-356, 2020 WL 1503444, at *2 (D.D.C. Mar. 27, 2020).  The Mayor of the District of Columbia has ordered the closure of all nonessential business, and this Court has postponed trials and other in-court proceedings in light of the pandemic.  *See In Re: Court Operations in Exigent Circumstances Created by the COVID-19 Pandemic*, Standing Order No. 20-9 (Mar. 16, 2020) (BAH); *In Re: Use of Video Conferencing and Teleconferencing for Certain Criminal and Juvenile Delinquency Proceedings*, Standing Order No. 20-17 (Mar. 30, 2020) (BAH).  Over 80 inmates at the D.C. Jail have now tested positive for the virus, and one of the infected inmates has died.

Thomas is 42 years old and entered the D.C. Jail in October 2017 with no reported respiratory health conditions.  *See* Thomas DOC Records at 390–91.  In December 2019, however, Thomas was diagnosed with sarcoidosis, *id.* at 58, a "multisystemic disorder of unknown cause," which is "characterized by the formation of immune granulomas in involved organs," Nunes *et al.*, Sarcoidosis, 46 Ophanet J. of Rare Diseases 2 (Nov. 19, 2007), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2169207/.  "The lungs and the lymphatic system are predominately affected but virtually every organ may be involved," and, in most cases, the condition "is revealed by persistent dry cough, eye or skin manifestations, peripheral lymph nodes, fatigue, weight loss, fever or night sweats, and erythema nodosum."  *Id.*  Many of the symptoms of sarcoidosis are also symptoms of COVID-19.  *See* Dkt. 89 at 3 (quoting

Information About COVID-19 for Sarcoidosis Patients).  In more severe cases, moreover, sarcoidosis "is treated with immune-modulating therapies, which make patients more susceptible to infections, including infections from COVID-19."  *Id.*  Since his diagnosis, Thomas's sarcoidosis has advanced to "stage II," and he now presents "mild interstitial pulmonary lung disease."  *See* Thomas DOC Records at 49.  Recently, Thomas has complained of general malaise, shortness of breath, *id.* at 1, 8, and is "often nauseous or [has] shivers," Dkt. 89 at 6.

Thomas moves for release pursuant to 18 U.S.C. § 3145(b) and § 3142(e), arguing that he faces "an unacceptable risk to his health and well-being" due to COVID-19, "the growing number of infected detainees at the DC [j]ail," and the seriousness of his "underlying medical conditions."  Dkt. 89 at 1.  In the alternative, Thomas seeks release pursuant to 18 U.S.C. § 3142(i), Dkt. 89 at 15, which authorizes a judicial officer to "permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason," 18 U.S.C. § 3142(i).  The government opposes the motion, although it acknowledges that the "inquiry [requires a] balance of interests," Dkt. 92 at 17, that could shift based "upon any specific information the Court learns from the [Department of Corrections] about the defendant's sarcoidosis," *id.* at 28.

On April 15, 2020, the Court held a hearing on Thomas's motion.[1]  The Court informed the parties that it had reviewed medical records provided by the District of Columbia Department

---

[1]  Because the Court concluded that the hearing could not be conducted in person without seriously jeopardizing public health and safety and that video teleconferencing was not reasonably available, the Court exercised its authority, pursuant to Chief Judge Howell's March 30, 2020 Standing Order, *see In Re: Use of Video Conferencing and Teleconferencing for Certain Criminal and Juvenile Delinquency Proceedings*, Standing Order No. 20-17 (Mar. 30, 2020)(BAH), and the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"),

of Corrections ("DOC") and that those records confirm that Thomas suffers from stage II

"cutaneous sarcoidosis," a severe condition affecting his lungs and potentially other organs; that

he has "mild interstitial lung disease;" and that he has reported to the jail's infirmary several

times, reporting that he feels ill and has experienced shortness of breath.  Apr. 15, 2020 Hrg. Tr.

(Rough at 1–2).[2]  The Court also observed that the records indicate that D.C. Jail had planned to

refer Thomas "to an outside facility for a chest x-ray or chest exam of some type," but that the

referral has been delayed because of the pandemic.  *Id.* (Rough at 2).  Based on the medical

records, the Court found that Thomas "falls in the category of [those] having . . . serious lung

disease" who are "at high risk with respect to the virus."  *Id.* (Rough at 3).  Finally, the Court

noted that pretrial services has done an initial investigation and has concluded that Thomas could

be released into the custody of his sister, Ms. Gwendolyn Geohaghan, although he is currently

subject to a detainer issued by a Maryland court on an apparently related matter.  *Id.* (Rough at

3).  Because the Maryland court is operating on only a limited basis due to the pandemic,

Thomas's counsel has been unable to determine whether the detainer can be withdrawn, and

neither Thomas's counsel nor counsel for the government knows whether the Maryland

---

H.R. 748, Div. B, Title V, § 15002(b)(1), to conduct the proceeding via telephone conferene.
The defendant, after consulting with his counsel, consented to proceeding in this manner.  Dkt.
95; April 15, 2020 Hrg. Tr. (Rough at 1).

[2]  The Court, with consent of the defendant, subsequently released a redacted version of
Thomas's DOC Medical Records.  The redacted version contained information relevant to his
sarcoidosis, and omitted most other information, such as notes from mental health consultations.
The Court raised the prospect of sharing certain other information in the records that might be
pertinent to the motion, but Thomas objected.  At the invitation of the Court, Thomas then filed
an *ex parte* brief setting forth the grounds for his objection.  Minute Order (Apr. 17, 2020).
Among other reasons, Thomas argued that the information is subject to the psychotherapist-
patient privilege, *see Jaffee v. Redmond*, 518 U.S. 1 (1996), and could not be released without his
consent.  After reviewing the records and relevant case law, the Court agreed that the privilege
appears to apply and, therefore, did not disclose the other portions of the records.  *See* Dkt. 96.

authorities are likely to execute the pending warrant. *Id.* (Rough at 4–9). Thomas's counsel has filed a motion, by mail, with the Maryland court seeking withdrawal of the detainer and has agreed to keep the Court updated regarding the status of the detainer. *Id.* (Rough at 4).

The Court also heard directly from Ms. Geohaghan. She explained that she resides with her husband and two children; that the children are home from school due to the pandemic; that she is a mobile hairstylist but is unable to work "until the pandemic is over;" and that her husband works as a security guard but is taking many precautions, including wearing gloves and a mask, "practicing social distancing," and "doing all different types of disinfecting and sanitizing." *Id.* (Rough at 14–15). When the Court inquired whether her husband used a firearm in the course of his work, she responded that he does but that he does not bring the firearm home and that there are no firearms at her residence. *Id.* (Rough at 21). She further reported that no one in her household has had any symptoms of the virus or has "been in contact with somebody [that] has . . . the virus," *id.* (Rough at 15), and that she is not permitting "outside visitors [to] come in[to] [her] house," *id.* (Rough at 39). Finally, Ms. Geohaghan agreed that, if the Court were to release Thomas during the pandemic, she would take responsibility for him, and, if directed, would provide the Court with periodic declarations attesting to whether he is complying with the terms of his pretrial release. *Id.* (Rough at 16).

The Court also engaged in a colloquy with Thomas. He described the conditions at the D.C. Jail and his anxiety regarding possible exposure to the virus in light of his medical condition. *See id.* (Rough at 34–38). Thomas, moreover, affirmed that he thoroughly appreciates the he would risk contracting a life-threatening illness were he to leave his sister's home while on temporary release. *See id.* (Rough at 24).

## II.  ANALYSIS

### A.      Probable Cause and Presumption

Because Thomas moves for release under 18 U.S.C. § 3145(b), the Court will review the
magistrate judge's detention order *de novo*.  *See Taylor*, 289 F. Supp. 3d at 63.  The Court
agrees, as a threshold matter, with the magistrate judge's conclusion that the presumption that no
pretrial release conditions will reasonably assure the safety of the community is triggered by the
indictment.  Dkt. 5 at 5.  Although the indictment has been superseded twice since the detention
hearing, Dkt. 8; Dkt. 83, Count Two of the operative indictment charges Thomas with Using,
Carrying, Brandishing, and Possessing a Firearm During a Crime of Violence, Dkt. 83, which
carries a minimum sentence of seven years, 18 U.S.C. § 924(c)(1)(A)(ii), and falls within the list
of crimes that trigger the presumption, *id.* § 3142(f), as does Count One of the indictment,
Interference with Interstate Commerce By Robbery, which is a crime of violence, *see* 18 U.S.
Code § 3156(a)(4).

The Court concludes, however, that Thomas has now come forward with sufficient
evidence to meet his burden of production, overcoming but not bursting the presumption in favor
of detention.  *See Taylor*, 289 F. Supp. 3d at 63.  Most importantly, Thomas has offered evidence
that he has suffers from sarcoidosis and that he presents a heightened risk if exposed to the
escalating number of detainees infected with COVID-19 at the D.C. Jail.  This evidence is
relevant because, as explained below, it reduces the likelihood that, if released to home
confinement, Thomas will pose a danger to the community.  Because Thomas has met his
modest burden of production, the Court will consider all of the factors set forth in § 3142(g) to
determine whether detention is warranted.

**B.      Section 3142(g) Factors**

The first and second factors weigh in favor of detention.  First, even accounting for the firearm's inoperability, the Court agrees with the magistrate judge's finding that the nature and circumstances of the offenses charged are undeniably serious.  The suspect brandished a firearm in the direction of the store clerk during an armed robbery to instill fear and to accomplish his purpose of committing a robbery.  Even beyond causing the same fear and lasting trauma that can be caused by a robbery using a functioning firearm, the use of an inoperable firearm could have prompted law enforcement or others to respond with deadly force, posing a threat to innocent bystanders.  Second, although Thomas has now offered some controverting evidence, the weight of the evidence against him is still substantial.  The store clerk saw the suspect leave the cell phone at the counter, several video surveillance cameras corroborate the clerk's narrative, and Thomas's DNA—along with the DNA of others—was found on the phone.  Dkt. 92 at 10.  Although the phone was subscribed to someone else, it "listed the defendant's nickname," *id.* at 10, and "[e]xtraction data from the [] phone revealed that [it] contained photographs of [him], video clips of [him], and individuals in the contacts list who can be connected to [him]."  *Id.* at 4.  Likewise, the cap worn by the suspect as captured in the surveillance footage matches the cap recovered in Thomas's residence.  *Id.* at 10.  This evidence more than offsets the *Brady* evidence Thomas has offered.

If the Court considers the third and fourth factors without regard to the pandemic, they weigh in favor of detention.  But, if the Court considers the evidence regarding Thomas's significant medical issues and the risk that he will face life-threatening circumstances if he contracts the virus, the balance tips in favor of release—albeit subject to strict conditions and only for so long as the pandemic threatens Thomas's safety.

As to Thomas's personal characteristics, he "is a life-long resident of the District of Columbia metropolitan area," Dkt. 89 at 11, and, if released, he would reside with his sister in D.C.  As government concedes, even though Thomas's criminal history is lengthy, much of it is stale.  Dkt. 92 at 12.  Although he has a 2012 state conviction for Wearing, Carrying, and Transporting a Handgun, and a 2003 conviction for Escape, Dkt. 11, in the "five years preceding his arrest," he also "worked as a carpenter's assistant on jobs as needed for Mr. William Jackson, who also served as Mr. Thomas' mentor through a neighborhood ministry program."  Dkt. 89 at 11.  Most significantly, Thomas has now been diagnosed with sarcoidosis, and is, therefore, particularly vulnerable to the ongoing COVID-19 pandemic.  Because of this development, Thomas now has a life-threatening reason to obey conditions of release that require that he remain on home confinement.  If he violates those conditions, he risks being "sent back to the D.C. Jail, where he might be unable to distance himself from others in the manner urged by the CDC, and the risk that he would come into contact with someone while outside his home, who could infect him."  *United States v. Mclean*, 19-cr-380 (RDM) (D.D.C. March 28, 2020). Thomas has confirmed that he understands the gravity of these risks and the importance of abiding by any Court-imposed conditions of home confinement.  April 15, 2020 Hrg. Tr. (Rough at 24).  This consideration, moreover, is also relevant to the nature and seriousness of the danger to the community that would be posed by Thomas's release.  As someone at high risk if infected with the virus, Thomas "has [a] compelling reason to stay home," and that incentive is "compounded by that fact that, if he violates his release, he risks returning to the D.C. [J]ail." *Mclean*, 19-cr-380, at 5.

The government contends that COVID-19 is not a sufficient basis for Thomas's release. Dkt. 92 at 16.  The Court agrees that, if the government has shown by clear and convincing

evidence that no condition or combination of conditions would reasonably assure the safety of the community if Thomas is released, then COVID-19 would not be a sufficient basis, by itself, to order him released pursuant to § 3142(e).  At the same time, however, the government has failed to address how COVID-19, and Thomas's particular vulnerability to it in the D.C. Jail, alters the dangerousness calculus by making it significantly more likely that Thomas will obey the conditions of his release and thus not pose a danger to the community.[3]

## C.    Weighing the Bail Reform Act Factors

Thomas's motion presents a close question.  As explained above, two of the four factors continue to weigh in favor of detention, albeit not as heavily as before, and two factors weigh against detention, but only so long as the pandemic affects day-to-day life in District of Columbia.  As the magistrate judge previously found, the nature of the crimes with which Thomas is charged are inherently dangerous.  Because the firearm was inoperable, that danger may be slightly less than the magistrate judge assumed.  But the conduct alleged in the superseding indictment is still dangerous; it presumably imposed significant, lasting harm on the victims; and it signals the type of disregard for community safety that would ordinarily demand pretrial detention.  Accordingly, were it not for the pandemic, the Court would find that no conditions of Thomas's release would reasonably assure the safety of the community.  The pandemic, however, makes a difference, and the Court is convinced that—*as things currently*

---

[3]  The government also contends that Thomas has not shown that he would be safer from COVID-19 upon release than he would be in jail.  Dkt. 92 at 22–23.  The Court is unpersuaded. Although the Court recognizes that the DOC is taking steps to protect inmates, the Court also has little doubt that Thomas would be better equipped to practice social distancing and to take other recommended preventative steps residing with his sister than he would be at the D.C. Jail.  As recounted above, Thomas's sister testified that she and her children remain at home except for essential activities, such as grocery shopping.  And, although her husband continues to work, the risk of contracting the virus from him is smaller than the risk Thomas faces by exposure to the prison population.

*stand*—Thomas's release into the custody of his sister and subject to strict conditions is unlikely to pose a risk to the safety of the community (or to pose a risk of flight).

Because the Court would order that Thomas remain in pretrial detention if it were not for the pandemic and the acute risk that the pandemic poses to his health, and because the Court is unable to predict how long the current public health crisis will last, the Court is not persuaded that it should set aside the magistrate judge's findings that pretrial detention is warranted under the § 3142(g) factors, and concludes, instead, that Thomas's motion should be resolved under § 3142(i), which is better tailored to the present circumstances. Under this approach, the § 3142(g) factors remain important, but rather than inform whether the Court should grant pretrial release pursuant to § 3142(e), they inform the Court's consideration of whether "compelling reasons" justify Thomas's temporary release.

**D.      Section 3142(i)**

Section 3142(i) provides that a "judicial officer may . . . permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. 3142(i). Much of Thomas's § 3142(i) argument is devoted to the proposition that he cannot adequately prepare his defense because the D.C. Jail has discontinued visits and phone calls with counsel "are limited in number and [are] recorded by the [j]ail" and thus do not provide an adequate alternative to in-person visits. Dkt. 89 at 15. On this point, the Court agrees with the government that Thomas has not met his burden of showing that his release is "necessary" for the preparation of his defense. Although his counsel did tell the Court that the process of conferring with her client by telephone can be difficult to navigate, she did not explain how that difficulty makes his release *necessary* for the

preparation of his defense.  April 15, 2020 Hrg. Tr. (Rough at 19–21).  Indeed, even if Thomas were released, given the need for social distancing and Thomas's heightened vulnerability to COVID-19, it appears likely that he would not meet in-person with his attorney.  To be sure, it is presumably easier to arrange a telephone call with a defendant who is not incarcerated.  But neither Thomas nor his counsel has said that telephonic consultation is unavailable for defendants incarcerated at the D.C. Jail, and the government has represented that it has—and will continue to—take steps to ensure that privileged conversations remain confidential.

That does not end the § 3142(i) inquiry, however, because the Court may also order the temporary release of a person for "another compelling reason."  Although courts typically order release on that ground only "sparingly," courts have increasingly found that a defendant's unique vulnerability to COVID-19, when combined with other appropriate considerations, such as "the original grounds for the defendant's pretrial detention," "the proposed release plan," and "COVID-19 risks to others," can justify a defendant's temporary release.  *See Davis*, 19-cr-292, at 4 (collecting cases).

Here, there are compelling reasons for Thomas's temporary release.  He is suffering from stage II sarcoidosis, a condition that affects his lungs.  The CDC has recognized that people of all ages with underlying medical conditions, including respiratory conditions, are at a heightened risk of severe illness from COVID-19.  *See* Centers for Disease Control & Prevention, Groups at Higher Risk for Severe Illness, available at https://tinyurl.com/w4yd732.  Based on this CDC guidance, and given that Thomas is suffering from "pulmonary lung disease" that is already making it difficult for him to breathe, *see* Thomas DOC Medical Records at 1–2, the Court finds that he likely at a high risk of severe illness from COVID-19.  This heightened risk is particularly serious given the escalating number of inmates who have tested positive for COVID-19 in the D.C. Jail

The threat to Thomas's health from COVID-19 is "both real and imminent." *Davis*, 19-cr-292, at 5.  If Thomas is infected at the jail, moreover, he will likely require significant medical resources and attention, burdening a "the jail's limited healthcare resources." *Id.*  The Court also finds that Thomas's sister is an "appropriate person" to take custody of Thomas if released. *See United States v. Stephens*, No. 15-cr-95, 2020 WL 1295155, at *7 (S.D.N.Y. Mar. 19, 2020) (The "case law suggests that family members may constitute 'appropriate persons' where the defendant is released to relatives and placed under house arrest.").

Countervailing factors do not outweigh these compelling reasons.  As explained above, although Thomas's crime is serious and the weight of evidence against him substantial, it is unlikely that Thomas will pose a risk to safety of the community or a risk of flight while the District of Columbia remains subject to the pandemic.  Simply put, by leaving his sister's home, Thomas would risk infection; would risk return to the D.C. Jail, where social distancing is far more difficult than in his sister's home; and, either way, would place his life at risk.  The Court can further protect the community and reduce the risk of flight, moreover, by imposing a series of strict conditions on Thomas's release, including location monitoring and requiring periodic reports from Thomas's sister, who has agreed to accept responsibility for Thomas while he is on temporary release.

The final issue is the detainer that is currently pending against Thomas.  It is the Court's understanding that the U.S. Attorney's Office will notify the Maryland authorities of the Court's order and that the Maryland authorities will make their decision about whether take Thomas into custody.  The decision of the Maryland authorities about how to proceed is beyond the scope of this Court's authority.  If the Court knew that it would accomplish little by ordering Thomas's release—and that he would simply move from one jail to another—that might well weigh against granting his motion.  But neither the Court nor the parties know what Maryland will do, and, given the burden that the pandemic has imposed on federal and state judicial systems and law enforcement agencies, it

does not appear that we will know what Maryland will do before the Court needs to resolve this emergency motion.  The Court is, accordingly, persuaded that it should grant Thomas's motion with the understanding that Maryland may—or may not—decide to enforce the pending warrant.

## CONCLUSION

For the reasons explained above, it is hereby **ORDERED** that the Defendant's motion to be released pursuant to 18 U.S.C. § 3145(b) and § 3142(e) is **DENIED**, and his motion for temporary release under § 3142(i) is **GRANTED**.  It is further **ORDERED** that

1.  Thomas shall be temporarily released into the custody of his sister, Ms. Gwendolyn Geohaghan, and shall be confined to her residence for the duration of his release.

2.  If the Department is able to administer the COVID-19 test prior to Thomas's release, it should do so, and if Thomas tests positive for the virus, the Department shall notify the Court before effecting Thomas's release.

3.  Upon release, Thomas shall immediately report to the pretrial services at 633 Indiana Ave NW 9th floor to be placed on a type of electronic monitoring device to be determined by the agency.  If Thomas is released from custody after 4:00 pm, he shall report to pretrial services at 9:00 am the next business day to be placed on electronic monitoring.  He is required properly to maintain and charge the monitoring device each day.  Any attempt to tamper with or mask the device's monitoring capability may result in revocation of his temporary release and/or additional criminal charges.

4.  Upon release, Thomas shall remain on home incarceration at Ms. Geohaghan's residence and may not change his residence without prior notification to, and approval of, the Court.  He shall be restricted to 24-hour-a-day lock-down at the residence except for medical necessities, court appearances, court-ordered obligations, or other activities specifically approved by the Court or pretrial services.  If the Department is unable to perform a COVID-19 test before Thomas is released, Ms. Geohaghan is encouraged to

quarantine Thomas within her home for 14 days after his arrival to ensure that, if he is infected, he does not endanger her or her family.

5. Thomas shall abide by any instructions he receives from pretrial services concerning his release.

6. Thomas shall not use or unlawfully possess narcotic drugs or other controlled substances defined in 21 U.S.C. § 802, unless prescribed by a licensed medical practitioner.

7. Thomas shall be subject to testing by pretrial services for prohibited substances at random frequency.  Testing may include urine testing, the wearing of a sweat patch, a remote alcohol testing system, and/or any form of prohibited substance screening or testing.  Thomas shall not obstruct, attempt to obstruct, or tamper with the efficiency and accuracy of prohibited substance screening or testing.

8. Thomas shall participate in a program of inpatient or outpatient substance abuse therapy and counseling if directed by the pretrial services office or supervising officer.

9. Thomas shall not possess any firearm, destructive device or other dangerous weapon.

10. Thomas shall avoid all contact, direct or indirect, with any person who is or may be a victim or witness in the investigation or prosecution.

11. At least once a week, Ms. Geohaghan shall send Thomas's counsel an email in the form described in Exhibit A, and Thomas's counsel shall promptly file each such email with the Court.

12. At least twice a week, Thomas shall report to pretrial services by telephone, or as otherwise directed by the agency.

13. Any violation of this Order by the Defendant may be treated as criminal contempt.

14. When the Court determines that there are no longer compelling reasons for Thomas's temporary release pending disposition of this case under 18 U.S.C. § 3142(i), the Defendant shall return to the custody of the United States.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  April 20, 2020